2023 IL App (1st) 220774-U
No. 1-22-0774
Order filed February 6, 2023

First Division

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except for the limited circumstances allowed under Rule 23(e)(1)

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re* THE INTREREST OF A.G., a Minor. | ) ) ) | Appeal from the Circuit Court of Cook County. |
| (THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | |
| Petitioner-Appellee, | ) ) | No. 16 JA 1025 |
| v. | ) ) | Honorable |
| S.G., | ) ) ) | Bernard J. Sarley, Judge, presiding. |
| Respondent-Appellant). | ) | |

_____

JUSTICE HYMAN delivered the judgment of the court.
Presiding Justice Lavin and Justice Pucinski concurred in the judgment.

**ORDER**

¶ 1    *Held*: The circuit court's decision that the best interest of the minor child was to terminate her wardship, appoint her foster parents as guardians, and close the case not against the manifest weight of the evidence.

¶ 2    Six-year-old A.G has been in the custody of the Department of Children and Family Services since shortly after birth. For more than five years, she has resided with foster parents. DCFS moved to close the case and appoint her foster parents as guardians. After a hearing, the circuit court granted the relief, finding it in A.G.'s best interest. The child's father, S.G.,

appeals, arguing the manifest weight of the evidence did not support the court's ruling. We disagree and affirm.

¶ 3                                          Background

¶ 4          On November 22, 2016, the State filed a petition for adjudication of wardship and a motion for temporary custody of A.G., then a week old. The petition listed K.R. as the mother and S.G. as the putative father. (K.R. is not a party to this appeal.)

¶ 5          The petition alleged A.G. was taken into DCFS custody and deemed neglected due to an injurious environment. She also was alleged to be abused due to exposure to a substantial risk of physical injury by other than accidental means. The allegations were predicated on K.R.'s prior indicated report for cuts, bruises, welts, abrasions, oral injuries, and substantial risk of injury or environment injurious to health or welfare by neglect. Further, K.R. has four more children in DCFS's care with findings of abuse, neglect, physical abuse, or a combination of these findings.

¶ 6          An affidavit supporting the motion for temporary custody indicated K.R. had neither complied with reunification services nor was considered capable of caring for a newborn. The affidavit stated K.R. had a history of abuse or excessive corporal punishment with her children, none of whom were ready to return to her care.

¶ 7          The circuit court placed A.G. in the temporary custody of the DCFS Guardianship Administrator in 2016. The circuit court also granted S.G. supervised day visits and gave DCFS discretion to begin unsupervised day or overnight visits with notice to the Public Guardian.

¶ 8          In February 2017, DNA testing confirmed S.G. as A.G.'s father. DCFS then moved to amend its petition alleging that S.G. had two other children who were named parties in an order

of protection against him. The circuit court granted the motion. Also, in February 2017, A.G. was placed in the foster home of A.B. and S.B., in whose care she remains. Two of her biological sisters also reside with the couple.

¶ 9    In November 2018, the court entered an order granting S.G. unsupervised day visits for the upcoming weekend pending the results of a risk assessment by DCFS. At the dispositional hearing, the court found K.R. and S.G. unable to care for A.G., who was then two years old, made her a ward of the court, and placed her in the guardianship of the DCFS Guardianship Administrator. The order stated appropriate services aimed at family preservation and reunification had been unsuccessful. The court also granted S.G. unsupervised day visits at least twice weekly and gave DCFS discretion to start unsupervised overnight visits with notice to the parties and certain restrictions.

¶ 10    After that, the court set a permanency goal for A.G. to return home within five months. About a year later, the court also entered another permanency order, again setting A.G.'s goal to return home in five months, finding S.G. was visiting with A.G. and engaged in services.

¶ 11    In July 2021, after a hearing, the court entered a permanency order changing A.G.'s goal to private guardianship because A.G. was "in a stable foster home, the foster home [was] willing to maintain a relationship between the minor and her parents while providing permanency to this minor, minor's parents ha[d] not made the necessary progress in services to achieve return home."

¶ 12    On January 21, 2022, the court entered a permanency order, continuing to set the goal for private guardianship, again stating A.G. "has been in the foster home since coming into care, minor is doing well in the home, minor is bonded to the foster parents." A permanency hearing

report filed with the court stated that returning home was no longer the recommended goal because S.G. needs to re-engage in recommended individual therapeutic services, participate in recommended psychiatric evaluation, maintain consistent and safe visitation with A.G., and exhibit appropriate parenting skills to meet A.G.'s educational, medical, and mental health needs.

¶ 13     When A.G. was five years old, DCFS filed a petition to vacate its guardianship, terminate wardship, and close the case. DCFS also petitioned to appoint A.G.'s foster parents as guardians, asserting A.G.'s best interest.

¶ 14     On May 6, 2022, the circuit court held a Zoom hearing on the State's petition for private guardianship of A.G. and disposition for C.R. and J.K. The parents of all three children were present. The court decided to hear first the petition involving C.R. and agreed, on the State's request, to take judicial notice of the testimony in C.R.'s case for A.G.'s guardianship petition.

¶ 15                    May 6, 2022 Hearing

¶ 16     At the beginning of the hearing, the State sought to enter multiple exhibits into evidence. Relevant here, exhibit no. 1 constituted the DCFS service plan approved in December 2021 for K.R.'s eight children as well as the children's respective fathers, including S.G. It reported S.G. failed to exhibit appropriate parenting skills, lacked consistent visitation with his children involved in DCFS, and lacked progress in therapeutic goals which led to his discharge from therapy pending a psychological evaluation. One issue involved why S.G. had delayed obtaining a safety assessment of his home so he could resume unsupervised home visits with A.G. and a sister. According to the service plan, S.G.'s unsupervised visits with A.G and the

sister were reinstated in November 2020 after a home safety assessment, noting numerous unsuccessful attempts to get S.G. to schedule the assessment before October 2020.

¶ 17 Home visits were again suspended in December 2020, after A.G and the sister were diagnosed with "bug bites/scabies" after a visit to S.G.'s home. In addition, S.G.'s failure to comply with ongoing requests for medical information on the other children in his home and veterinarian records for his pets, as well as the need for ongoing requests for an updated safety assessment, prevented unsupervised overnight visits until July 2021. That October, overnight visits were again suspended due to health and safety concerns at S.G.'s home. S.G. had an overnight visit with A.G. and the sister at a hotel in November 2021, but another health concern arose, causing the suspension of unsupervised overnight visits.

¶ 18 The service plan also noted S.G. had completed anger management, a psychological evaluation, and domestic violence services but was unsuccessfully discharged from individual therapy. He was recommended for a new psychological evaluation to address his failure (i) to display appropriate parenting skills, (ii) to address past and present trauma, and (iii) to address domestic violence incidents. The service plan noted S.G. had agreed to participate in a psychiatric evaluation and individual therapy.

¶ 19 The plan stated A.G.'s permanency goal had been changed to guardianship in July 2021 based on her best interests. Further, A.G.'s foster parents had shown "a strong commitment" to A.G. and dedication to her care and were "strong" advocates for her. Similarly, A.G. showed a solid attachment to her foster parents, "as evidenced by smiles, laughter, hugs, and giggles in response to their presence." The plan stated guardianship was in A.G.'s best interest due to her need for permanency and her parents' inability to achieve reunification within the child's

sense of time. The plan noted the foster parents' home as the only stable home A.G. had known in her short life. According to the plan, A.G. made "remarkable progress in large part due to the care and advocacy that [the foster parents] have shown," and guardianship would allow her to remain stable, have all of her needs met, and still allow her to maintain a loving relationship with her biological parents and siblings.

¶ 20     Exhibit no. 8 was S.G.'s individual therapy report from therapist Rachel Herman, LCPC, indicating S.G. had received therapy at agency provider, Lawrence Hall, from September 2020 until November 8, 2021. The therapist stated that S.G. kept 90% of his appointments but failed to progress on any initial therapy goals. Specifically, S.G. refused (i) to acknowledge the domestic violence issues in his relationships, (ii) to take responsibility for his children's placement into DCFS care, or (iii) to explore improving his relationship with the foster parents. She noted S.G. made some progress in learning and implementing parenting skills, although he often struggled with following through on recommended actions.

¶ 21     The report further stated S.G. generally used sessions to express frustration with the expectations placed on him by the court, stating he preferred to do things "in his own time." He saw himself as a victim of the system and repeatedly said he had no power to impact movement toward reunification with his children. In addition, he tended to blame others for his inaction and refused to take accountability or display understanding that he could make different choices leading to different outcomes.

¶ 22     At the request of S.G. and his attorney, in June 2021, the therapist discharged the goals with which S.G. disagreed and developed alternate goals to identify and address barriers to reunification. Nonetheless, S.G. still could not identify or consider barriers to reunification and

blamed existing barriers on the agency and the court. The therapist further reported S.G. could not identify needs or concerns he could address through individual therapy to assist progress toward reunification. According to the therapist, it was unclear whether the barriers to reunification stemmed from S.G.'s lack of trust in the service providers, cognitive deficits, mental health issues, well-developed resistance to perceived authority, or some combination.

¶ 23　　　　After a clinical staffing conference in October 2021, individual therapy was terminated due to S.G.'s lack of progress and rejection of proposed therapy goals, driven by his perception therapy had not benefited him. Furthermore, if the upcoming psychological evaluation recommended individual therapy, S.G. should be referred to an external provider, given his mistrust of Lawrence Hall and its providers.

¶ 24　　　　People's exhibit no. 9 is a psychological evaluation for S.G. prepared by Dr. Michelle Iyamah, dated December 27, 2021. Dr. Iyamah reported S.G. presented in an overly favorable manner, did not acknowledge documented history of domestic violence and blamed DCFS for interfering with his relationships. Dr. Iyamah determined S.G. did not have cognitive deficits or impairments that would impact his judgment and decision-making, but his problems stemmed from personality traits and affective concerns, which providers had not addressed despite efforts. She diagnosed S.G. with depression and Unspecified Depressive Disorder and Other Specified Trauma and Stressor-Related Disorder. And, Dr. Iyamah concurred with prior findings of narcissistic personality disorder. She recommended individual therapy with a trauma focus, group therapy, and a psychiatric evaluation to explore his depression and determine medication. S.G. told Dr. Iyamah, the psychologist who completed his

psychological evaluation, and his former caseworker were friends, which influenced the psychologist's findings.

¶ 25    Julia Levy, the caseworker for A.G., C.R., and J.K, testified that based on S.G.'s psychological evaluation, she believed he needed to undergo individual therapy, a psychological assessment, and group therapy but was unwilling to cooperate. Levy said S.G. lived "periodically" with three other children, but she could not monitor them because two lived with their mother and visited him occasionally, and the youngest, a 10-year-old, lived with him as well as her grandmother.

¶ 26    On cross-examination, Levy acknowledged S.G. participated extensively with a prior therapist who recommended that if S.G. needed a referral for a new therapist, it should be made outside Lawrence Hall. But Levy testified S.G. refused to accept a new referral or participate in group therapy. Levy said that on at least one occasion, she visited S.G.'s home unannounced to see how he interacts with his children not under DCFS care and saw no issues. She said S.G. sees the children in DCFS care about once a week for an hour and is attentive.

¶ 27    S.G. testified and acknowledged he refused to continue individual therapy but would be willing to restart with a therapist unaffiliated with Lawrence Hall. He also would be willing to attend group therapy as long as it did not interfere with his job, noting he worked 45 hours weekly. He disagreed with the need for a psychological evaluation because "false information" was included in the report. He also disagreed with seeing a psychiatrist to determine if he might benefit from medication. He asserted his work hours and his ability to raise three children outside the system proved he was a functioning adult and willing to participate in recommended services.

¶ 28                          A.G.'s Guardianship Hearing

¶ 29        During the hearing on DCFS's petition to close A.G.'s case and appoint her foster parents as guardians, Julia Levy testified A.G. had been living in her current foster home since February 2017. The home was safe and appropriate with no indications of abuse or neglect and no unusual incidents. Levy confirmed the foster parents and family wanted to assume guardianship and were able to meet A.G.'s needs. Moreover, A.G. had a "very strong bond and attachment" to the foster family and expressed a desire to remain with her sisters and foster parents.

¶ 30        Levy said it was in A.G.s' best interest for the foster parents to become her guardians because they were providing for her needs and would continue to foster the relationship between A.G. and her biological family in a safe, appropriate manner. Levy acknowledged that although K.R. favored guardianship, S.G. was not. Nonetheless, the agency recommended the case be closed and guardians appointed, partly because A.G. had been in foster care since 2016, and neither parent made enough progress in services to have her return to their care. Levy confirmed all of her testimony in C.R.'s case regarding S.G.'s services pertained to A.G.

¶ 31        Levy confirmed the foster parents facilitated twice monthly unsupervised visits between A.G. and S.G. and twice weekly video calls. They expressed willingness to continue maintaining safe and appropriate visitation with S.G., and with A.G.'s mother and siblings if the court established guardianship.

¶ 32                          Foster Mother's Testimony

¶ 33        A.B. testified she and her husband were A.G.'s foster parents and meeting all of A.G.'s needs. She said they understand that if appointed as guardians, they would be responsible for

A.G.'s care and custody, including medical, educational, financial, and legal needs until she turns 18. She said A.G. was well integrated into their family, and she and her husband had custody of two of A.G.'s biological sisters with whom she shares a close bond. Explaining why she wanted to be appointed guardian, A.B said, "A.G. has been here for most of her life. She is loved. We would love to continue to provide a home for her with her sisters, and we fully support the relationship she has with both of her parents. We consider ourselves blessed to be able to love on her and her sisters."

¶ 34 A.B. was inclined to let the current visitation schedule with A.G.'s family continue. She said overnight visits with S.G. may be possible in the future but not at present due to past safety issues in S.G.'s home, where he continues to reside.

¶ 35 The State rested and again asked the circuit court to take judicial notice of the witnesses' testimony in C.R.'s case regarding S.G.'s services. The circuit court agreed.

¶ 36                                                  S.G. Testimony

¶ 37 S.G. testified he was against guardianship because A.G. wants to have a relationship with her siblings who are not in care. He acknowledged, however, that he and his other children have had a relationship with A.G. for six years and agreed he had a workable relationship with A.G.'s foster parents on visitation. He said he wanted overnight visitation with A.G.

¶ 38                                             Circuit Court's Decision

¶ 39 After argument, the circuit court found that A.G.'s best interest was to grant the petition for guardianship. The court noted A.G. had been in the foster parents' home almost since birth, and it was her home and family. Further, A.G. wanted to stay with them, and the foster parents supported doing everything they could to keep her safe and raise her. The court further declined

to enter a modified visitation order to grant S.G. unsupervised visits, finding A.B. and S.B. have been managing visitation with A.G., and the court believed they would consider expanding visitation. In addition, the court stated that the home was stable and further monitoring was not in A.G.'s best interest. The court granted DCFS's petition for private guardianship, vacated DCFS guardianship, appointed A.B. and S.B. as guardians, and closed the case.

¶ 40                                            Analysis

¶ 41                                      Standard of Review

¶ 42        To close this case and place A.G. in private guardianship, the circuit court was required to find, by a preponderance of the evidence, that this result was in A.G.'s best interest. *In re D.T.*, 212 Ill. 2d 347, 366 (2004). That finding will not be disturbed unless it is against the manifest weight of the evidence. *In re V.M.,* 352 Ill. App. 3d 391, 397 (2004). That requires a clearly apparent opposite conclusion, or the court's findings were unreasonable, arbitrary, and not based on the evidence. *In re Tasha L.-I.*, 383 Ill. App. 3d 45, 52 (2008). A strong presumption favors the result reached by the circuit court in child custody cases. *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 20; *In re S.K.B.*, 2015 IL App (1st) 151249, ¶ 28.

¶ 43        As a preliminary matter, we address S.G.'s contention that the circuit court did not take judicial notice of the exhibits the State presented in C.R.'s guardianship hearing and did not rely on them in ruling. S.G. contends absent those exhibits, the witnesses' testimony in A.G.'s case alone does not support granting the guardianship petition.

¶ 44        The record shows the circuit court set the case on the calendar as a family case to include A.G., C.R., and J.K. The parties and the court discussed the order in which to hear the petitions

involving the three children and for expediency, the court decided to hear C.R.'s dispositional hearing before A.G.'s so the court could then take judicial notice of the testimony in C.R.'s case. The court then asked the attorney for the State if she had any exhibits for C.R.'s case, not because, as S.G. contends, those exhibits were limited for use only in C.R.'s case, but because it was the first case heard. The State offered into evidence exhibits on K.R. and S.G., including the current DCFS family service plan, which included the plan for A.G. and S.G., the therapy discharge report for S.G., and S. G.'s psychological assessment. Further, after admitting the exhibits into evidence, the trial judge stated he received them the night before and read them, so there was no need to go into great detail on their contents.

¶ 45    Moreover, before Julia Levy testified in A.G.'s case, the judge reminded her she was "still under oath," further evidencing the cases were heard together. Moreover, without objection, Levy stated all of her testimony in C.R.'s case "with regard to [S.G] and the *** status with services would apply in [A.G.'s] case, as well." Her testimony extensively referenced the exhibits the State offered into evidence in C.R.'s case, including S.G.'s psychological reports and willingness to engage in services. So, the testimony and exhibits were properly before the circuit court in A.G.'s case.

¶ 46                    Issue of Manifest Weight of the Evidence

¶ 47    Turning to the merits, S.G. contends the circuit court's finding was against the manifest weight of the evidence. The Juvenile Court Act (705 ILCS 405/1-1 *et seq*. (West 2020)) defines a "best interest" determination as including consideration of:

"(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;

(b) the development of the child's identity;

(c) the child's background and ties, including familial, cultural, and religious;

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child." 705 ILCS 405/1-3 (West 2020).

¶ 48       Another factor courts have recognized as significant is the nature and length of the child's relationship with the present foster parent. See *Tajannah O.*, 2014 IL App (1st) 133119 ¶¶ 19-29; *In re Angela D.*, 2012 IL App (1st) 112887, ¶¶ 37-39. In some cases, another factor is that

the foster parent is willing to allow continued contact between the child and the biological parents. *Angela D.*, ¶ 41.

¶ 49   Although the circuit court did not separately discuss each best interest factor, the court's explanation for granting the motion makes plain it properly considered and carefully balanced the statutory factors.

¶ 50   As to A.G.'s wishes, Julia Levy testified A.G. wanted to remain with her foster parents and biological sisters. The foster parents also wanted her to remain in their home. A.B. testified A.G. was loved, and she and her husband wanted to provide her with permanency through guardianship. As the circuit court noted, "this is her family. This is her home. She's been here all her life. She wants to stay. The foster parents are in support of in its decision, their home is her home, and she wants to stay."

¶ 51   As to A.G.'s sense of attachment, she had been living with her foster parents since February 2017, constituting more than five of her six years of life. The client service plan noted A.G. bonded to the foster parents, and testimony from Levy and A.B. indicated A.G. was well cared for in the home and integrated into the family. Levy testified that A.G.'s feels love and attachment in her foster home, and her service plan states she responds positively to her foster parents and her biological sisters who live there. As the circuit court ruled, A.G. had been in the foster home practically since birth, and it was her home.

¶ 52   S.G. contends three statutory factors weigh against the circuit court's finding. First, he claims no evidence showed A.G.'s physical safety and welfare were in peril when she was with him. Specifically, he asserts, "[v]ery little was placed before the circuit court that indicates [he] has or otherwise suffers from mental health issues that support shifting the permanency goal

to guardianship." We disagree. Dr. Iyamah diagnosed S.G. with depression and concurred with prior findings that S.G. showed signs of an underlying personality disorder consistent with a narcissistic personality disorder. She recommended continued individual therapy and group therapy. Although S.G. testified he was willing to participate in both, Levy testified S.G. was unwilling to cooperate with a psychological assessment or group therapy. And nothing in the record shows he did so.

¶ 53　　　　Moreover, the service plan stated overnight visits in S.G.'s home were suspended multiple times due to safety factors impacting health and safety, and S.G. delayed obtaining a safety risk assessment.

¶ 54　　　　S.G. argues A.G.'s background and ties, including familial, cultural, and religious, weigh against guardianship because it does not maximize her time with him and his biological children, to whom he has "unsupervised access."

¶ 55　　　　The evidence showed A.G. has been living with her two biological siblings since being placed with the foster parents as a baby and with whom she has a close bond. Further, S.G. and his biological children have had ongoing contact and visitation with A.G. while she has been in the foster parents' care, and A.B. testified she would continue to support those visits.

¶ 56　　　　As to the A.G.'s need for permanency, this includes stability and continuity of relationships with parent figures, siblings, and other relatives. Levy testified the foster parents supported A.G.'s relationship with S.G., and that would continue. A.B. testified that although overnight visits were not currently possible, she would consider them in the future. The court praised the foster parent's management of visits between A.G. and her biological family and said it was confident they would continue to do so.

¶ 57        Further, the service plan stated that during the six years A.G. had been in foster care, S.G. had not completed the necessary services to recommend the goal of a return home. The court's option, other than closing the case and appointing a guardian, was to leave her in foster care indefinitely until S.G. re-engaged in and completed services. That course of action would be contrary to A.G.'s need for permanency and stability. *In re C.C.*, 299 Ill. App. 3d 827, 702 N.E.2d 598 (1998) (trial court does not have to wait indefinitely for parent to make reasonable efforts or progress toward regaining custody; ultimately, all parental rights must yield to best interests of child).

¶ 58        S.G. argued the circuit court placed too much emphasis on permanency, which was difficult to achieve because of delays caused by the Covid-19 pandemic. But S.G. presented no evidence showing the pandemic prevented him from engaging in services. Notably, the case came into the court system in 2016, and he was conclusively determined to be A.G.'s father in 2017, three years before the pandemic. And while the pandemic may have delayed court proceedings, the record shows permanency was not achieved because S.G. failed to make progress in reunification services.

¶ 59        After considering the evidence and testimony, the circuit court concluded it was in A.G.'s best interest that the case be closed and A.G. be placed in guardianship with the couple she had lived nearly her entire life and with whom her biological sisters reside. That finding was not against the manifest weight of the evidence.

¶ 60        Affirmed.